**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS, and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**July 2, 2012**

# In the Court of Appeals of Georgia

A11A2377. THOMAS et al. v. HENRY COUNTY WATER AND
    SEWERAGE AUTHORITY.

BARNES, Presiding Judge.

This case involves a boundary dispute over a portion of the South River riverbed located on the Henry and Newton County line, in an area known as Snapping Shoals, and additional land including a portion of the riverbed and dry land in Henry County. The trial court denied summary judgment to Hoke Thomas, Jr. and the estate of Michael Thomas ("the Thomases") and granted it to the Henry County Water and Sewerage Authority ("the Water Authority"), concluding that the Authority owns the title to the disputed land, subject to an easement. The Thomases appeal, arguing that the trial court erred, but for the reasons that follow, we affirm.

The Thomas brothers bought land on the Newton County side of the river in 1976 and have been operating a hydroelectric power generating station there ever since. The Thomases and Henry County dispute ownership of 4.82 acres of riverbed and dry land in Henry County and of additional land including the riverbed at Snapping Shoals (collectively, the "disputed land"). Initially, the Thomases would not allow the Water Authority to survey the boundary lines of the disputed property, so the Authority filed a complaint for injunctive relief, seeking authority for their surveyors to enter onto the disputed land. After an initial hearing, the Water Authority amended the resolution that authorized the complaint by stating that they might want to use this property for a public purpose at some future time, and the Thomases agreed to allow the survey. The trial court entered an order enjoining them from preventing the surveyors from entering onto the property for 30 days, and the property was surveyed. The Thomases then answered the complaint and counterclaimed for a declaratory judgment as to ownership of the disputed land.[1]

The parties conducted extensive discovery, and the record establishes that all of the property owned by these parties was previously owned by Whitehead Die

---

[1]The trial court noted that this is not an action to quiet title, and its ruling applies only to the parties in this case.

Casting Company, Ltd. In 1976, Hoke and Michael Thomas bought 8.1 acres from Whitehead Die, on which a mill was located, and obtained certain water rights and easements over Whitehead Die's other property as needed to maintain water power for the mill. On June 21, 1976, the Thomases recorded a warranty deed showing that their property line ran to the middle of the riverbed. The Thomases contend that Whitehead Die gave them an additional 4.82 acres in 1977, extending their property line from the middle of the riverbed onto a portion of dry land in Henry County. Inexplicably, only the plat from 1977 was recorded contemporaneously, but not the deed. The deed was discovered in a flood-damaged safe inside the mill and recorded on June 8, 2008, after this litigation began. The Thomases began operating a hydroelectric generating station on the property in 1976, using water diverted from the South River by the dam and the "mill race," a canal that diverts the water from the river to the mill.

In 1991, Whitehead Die's heirs sold to John Hanger property abutting the Thomases' property in Henry County. Hanger intended to buy "all the remaining property that the Whitehead Die Casting Company, Ltd., had an interest in," or the entire original property of Whitehead Die except those portions already sold to other buyers. The 1991 warranty deed from the heirs described Hanger's property by

reference to an attached plat, which described the property line as being "along the bank of [the] river."

In 2004, the Thomases applied to the State Environmental Protection Division ("EPD") for a permit to withdraw 30 million gallons of water per day from the South River at Snapping Shoals for treatment and distribution to six surrounding counties. The EPD directed the Thomases to consult the surrounding county water authorities about entering into a public-private venture, and the Thomases presented the proposal to the Henry County Board of Commissioners. The Board directed the Thomases to discuss the matter with the Water Authority, which rejected the proposal, apparently due to concerns about the water quality.

In 2008, Hanger agreed to sell the Water Authority a portion of the riverbed and land in Henry County, but after researching titles, the Authority discovered that the plat described in Hanger's 1991 deed from Whitehead Die's heirs described land that did not include a portion of the disputed land. In February and March 2008, the Water Authority obtained quit-claim deeds from Whitehead Die's heirs to Hanger, to clarify that they had intended to sell to Hanger all the property that had not already been sold to others, which included the 4.82 acres to which the Thomases had an unrecorded deed. The 2008 quit-claim deeds conveyed to Hanger three tracts of land

4

previously owned by Whitehead Die, a total of approximately 273.6 acres, specifically excepting all of the property that had previously been conveyed to approximately 12 other parties.

The parcels excepted from the sale of Whitehead Die's property to Hanger included the property sold to and recorded by the Thomases in 1976, but not the unrecorded 1977 deed granting them 4.82 acres in Henry County, which included both riverbed and dry land. The Water Authority then bought property from Hanger that included the 4.82 acres and the riverbed at Snapping Shoals. On March 31, 2008, the Water Authority recorded the quit-claim deeds from the Whitehead Die heirs to Hanger and the Limited Warranty Deed from Hanger to the Authority.

In April and May 2008, Water Authority representatives attempted unsuccessfully to obtain permission from the Thomases to survey the property the Authority had just purchased from Hanger, which led the Thomases to discover and record the 1977 deed from Whitehead Die granting them the 4.82 acres in Henry County.

After the complaint, injunction, and counterclaim were filed, the Water Authority moved for summary judgment on the Thomases' counterclaim, arguing that the undisputed facts showed that it owned the property it had purchased from Hanger.

5

The Thomases also moved for summary judgment, contending that they held superior title to the 4.82 acres by virtue of their 1977 deed, and also that they had prescriptive title to the Snapping Shoals riverbed and other disputed land through adverse possession. The trial court conducted a hearing in January 2010, and in June 2010 denied the motions for summary judgment. According to the trial court's final order issued in June 2011, at a pre-trial conference in July 2010 "both sides … insisted that a trial is not necessary" and both sides renewed their motions for summary judgment. The trial court granted summary judgment to the Water Authority and denied it to the Thomases, who appeal.

1. The Thomases contend on appeal that Hanger's quit-claim deeds are not entitled to priority because first, Hanger was not an innocent purchaser who bought in good faith and therefore could not convey good title to the Water Authority. They contend that Hanger had notice that they owned the disputed land, or was at least aware of facts that should have caused him to inquire further. Thus, they assert, Hanger's quit-claim deeds acquired no preference despite being recorded first.

Competing deeds conveying the same property are effective only when they are recorded, and in a contest between deeds of the same property from the same grantor, when taken without notice to the buyer and with consideration to the seller, the deed

6

filed first has priority. OCGA § 44-2-2 (b); *Church of the Nativity v. Whitener*, 249 Ga. App. 45, 47 (2) (547 SE2d 587) (2001). OCGA § 44-2-1 provides that "[a] deed may be recorded at any time; but a prior unrecorded deed loses its priority over a subsequent recorded deed from the same vendor when the purchaser takes such deed without notice of the existence of the prior deed." As the trial court found in this case, "it is undisputed that Hanger's 2008 deeds were recorded before [the Thomases'] 1977 deed."

The trial court also concluded that Hanger's quit-claim deeds were entitled to priority because he was an "innocent purchaser" who had no notice that the Thomases had a prior claim to the riverbed.

"A bona fide purchaser for value is protected against outstanding interests in land of which the purchaser has no notice. [Cit.]" *Farris v. Nationsbanc Mtg. Corp.*, 268 Ga. 769, 771 (2) (493 SE2d 143) (1997). "However, any circumstance which would place a man of ordinary prudence fully upon his guard, and induce serious inquiry, is sufficient to constitute notice of a prior unrecorded deed. And a younger deed, taken with such notice, acquires no preference by being recorded in due time." (Citations and punctuation omitted.) *Montgomery v. Barrow*, 286 Ga. 896, 897 (1) (692 SE2d 351) (2010).

7

The Thomases argue that the fact that the Water Authority told Hanger it would buy the property if Hanger got the deeds corrected put Hanger on notice that the Thomases had a claim to the disputed land. In other words, they argue that, because the Water Authority had reservations about Hanger's title to the disputed land, Hanger had notice that the Thomases claimed to own the disputed land before he filed the quit-claim deeds. They also argue that Hanger had a duty to investigate ownership of the disputed land because the Thomases had maintained the dam, riverbed, and mill race for 30 years.

The trial court correctly concluded that the Thomases' repeated and visible activities on the disputed land did not put Hanger on notice of their claim to own it. Because their 1976 deed from Whitehead Die granted them an easement to use the some of the disputed land, all of the Thomases' activities were consistent with their easements rights. Further, all of the structures related to the Thomases' hydroelectric facility are located on the 8.1-acre property they bought from Whitehead Die in 1976, about which there is no title dispute. Finally, the evidence shows that the Water Authority's reservations about Hanger's title were related to the wording of the deed from Whitehead Die's heirs, not to whether someone else owned that land, and therefore did not constitute notice of the Thomases' claims. The trial court did not err

in concluding that Hanger was an innocent purchaser who bought the disputed land without notice that the Thomases claimed ownership.

2. The Thomases also argue that the trial court erred in finding that Hanger's 2008 quit-claims deeds from Whitehead Die's heirs were supported by consideration, as required by OCGA § 44-2-1. The trial court held that the Thomases' argument

> ignores that undisputed evidence that Hanger obtained the 2008 quitclaim deeds for the riverbed without any additional consideration being paid based on the proposition that the riverbed had been mistakenly omitted from the 1991 deed. It is undisputed that Hanger paid valuable consideration for the 1991 deed. This serves as the valuable consideration supporting the 2008 corrective deeds as well. See 17A C.J.S. Contracts § 564; *Bullock v. Johnson*, 110 Ga. 486 (1) (35 SE 703, 705) (1900).[2]

This conclusion is logical and legally sound. If the parties intended, as the evidence shows, that Hanger purchase and the Whitehead Die heirs sell, all of the Whitehead property that had not previously been sold, then no new consideration was necessary to support deeds that clarified that intent, as the new deeds "rest upon the original

___

[2]While the Thomases assert that the trial court lacked authority to rule "sua sponte" that the consideration Hanger paid Whitehead Die in 1991 constituted consideration for the 2008 quit-claim deeds, the Thomases raised the consideration issue in their brief responding to the Water Authority's supplemental motion for summary judgment.

consideration." *Bullock*, 110 Ga. at 490. Hanger already owned that property, and that the quit-claim deeds rectified a mutual mistake by clarifying the boundaries of the property purchased in 1991.

The Thomases argue that the only evidence supporting the conclusion that the quit-claim deeds merely corrected a mistake was the "unilateral, self-serving declaration by Hanger" about his intentions in 1991 to acquire all of Whitehead Die's unsold land. But the fact that all 13 of the Whitehead Die heirs signed and returned quit-claim deeds also supports that conclusion, as do the quit-claim deeds themselves. The Thomases also argue that the fact that Hanger sold only the disputed land, which was added by the quit-claim deeds, confirms that the 1991 deed was accurate, but the disputed land was the only portion the Water Authority wanted to buy.

3. Finally, the Thomases contend that they adversely possessed the Snapping Shoals riverbed and other disputed land and thus acquired title by prescription. "To establish title by adverse possession a party must show possession not originated in fraud that is public, continuous, exclusive, uninterrupted and peaceable, and accompanied by a claim of right. OCGA § 44-5-161 (a)." (Citation and punctuation omitted.) *Bailey v. Moten*, 289 Ga. 897, 898 (2) (717 SE2d 205) (2011).

"Under OCGA § 44-5-165, actual possession may be evidenced by enclosure, cultivation, or any use and occupation which is so notorious as to attract the attention of every adverse claimant and so exclusive as to prevent actual occupation by another." *Friendship Baptist Church v. West*, 265 Ga. 745 (462 SE2d 618) (1995). The Thomases did not enclose or cultivate the riverbed, of course, but assert that they exercised dominion and control over it by damming the river upstream of their property, diverting the water through the mill race, and maintaining the riverbed. Regarding other disputed land, they also make numerous factual arguments about their exclusion of others from the property and representations from Whitehead Die principals affirming that the Thomases owned the dam.

"While adverse possession is usually a mixed question of law and fact – whether the facts exist which constitute adverse possession, is for the jury to judge. Whether, assuming the facts proven to be true, they constitute adverse possession, is for the court to decide." (Citation and punctuation omitted.) *Ga. Power Co. v. Irvin*, 267 Ga. 760, 766 (2) (482 SE2d 362) (1997). Aside from the trial court's recitation that the parties insisted a jury trial was unnecessary, the facts as set out by the trial court and as recited by the Thomases are insufficient as a matter of law to establish that the Thomases were in such notorious possession that they acquired title to the

11

disputed land by prescriptive easement or adverse possession. All of the Thomases'

actions were consistent with their 1976 easement, and therefore did not give notice

that they claimed the disputed land to the exclusion of others.

*Judgment affirmed. Adams and McFadden, JJ., concur.*